UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHABTIR SCOTT SHATSKY, et al | : | |
| | : | |
| Plaintiffs | : | |
| | : | 06 cv 724(RJL) |
| v. | : | |
| | : | |
| SYRIAN ARAB REPUBLIC, THE | : | |
| SYRIAN MINISTRY OF DEFENSE, MUSTAFA | : | |
| TLASS, SYRIAN MILITARY INTELLIGENCE, | : | |
| HASSAN KHALIL, ASSEF SHAWKAT, | : | |
| ALI DOUBA, THE SYRIAN AIR FORCE | : | |
| INTELLIGENCE DIRECTORATE and | : | |
| IBRAHIM HUEIJI, | : | |
| | : | |
| Defendants. | : | |

_____:

**SYRIA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS RULE 12(b) MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT FILED ON OCTOBER 24, 2007**

Ramsey Clark
Lawrence W. Schilling
37 West 12th Street, 2B
New York, NY 10011
212-989-6613
212-979-1583 fax
lwschilling@earthlink.net

Abdeen Jabara
113 University Place
8th Floor
New York, NY 10003
212-598-0646
Attorneys for the Syrian Defendants

# Table of Contents

Page

Table of Cases                                                                                              ii

Table of Authorities                                                                                        iii

Preliminary Statement                                                                                       1

Argument                                                                                                    3

I.      Article 2 Of The United Nations Charter Requires All Members
        To Act In Accordance With the Principle of Sovereign Equality
        On Which The U.N. Is Based And to Fulfill In Good Faith Their
        Obligation To Ensure The Sovereign Equality Of Each Member         3

A.      FSIA §1605(a)(7), as applied, Violates the Sovereign Equality and the
        Juridical Equality of the Syrian Arab Republic and the Obligation of the
        U.N. to Ensure the Sovereign Equality of all U.N. Members by Seeking
        to Subject the Syrian Arab Republic to the Coercive Power of U.S. Courts
        for Alleged Acts of State While Recognizing the Sovereign Immunity of
        Nearly all Other U.N. Members for All  Four Acts Stated in §1605(a)(7)    4

B.      Congress Did Not Intend to Violate the First Principle of the U.N. Charter
        – The Sovereign Equality of Nations by Enacting the FSIA Provisions       17

C.      Designations under Section 1605(a)(7) by Violating the Equal Sovereignty
        of U.N. Members Designated State Sponsors of Terrorism Have Seriously
        Impaired Efforts to End of the Scourge of War, Harmed the Peoples of the
        United Nations, Damaged the United States in the Conduct of Its Foreign
        Relations and Assaulted the Foreign States it has Unilaterally Labeled
        Terrorist and Attempted to Selectively Hold Subject to the Jurisdiction of
        U.S. Courts                                                               20

D.      The Power of the U.S. Secretary of State under FSIA §1605(a)(7) to
        Designate a Foreign State a Sponsor of Terrorism and the Procedures
        Followed are Lawless and Antithetical to the Rule of Law                  23

E.      The Syrian Arab Republic has Responded in this Case as a Courtesy to
        the United States Hoping that by Reasoning Together in U.S. Courts this
        Harmful and Unlawful Practice can be Ended and a Step Toward Better
        Relations Taken.                                                            25

II.     The claims of plaintiffs Miller and Zahav based on an alleged shooting
        attack on March 26,1991 are untimely under FSIA §1605(f) and are barred
        by Syria's sovereign immunity.                                              26

III.    The complaint's allegations that Syria provided support and resources for
        acts of extrajudicial killing by the PLO are general, conclusory and boilerplate,
        and inadequate to provide the nexus and causation required for subject matter
        jurisdiction under FSIA §1605(a)(7).                                        29

IV.     Multiple Violations Of Due Process and Fundamental Fairness under the
        Constitution of the United States and International Law Require The
        Dismissal Of This Action Against The Syrian Defendants Under
        Fed.R.Civ.P. 12(b).                                                         35

Conclusion                                                                          39

# Cases

Argentine Republic v. Amerada Hess Shipping Corp.,
    488 U.S. 428, 434 (1989).                                  19

Asahi Metal Indus. Co., Ltd. v. Superior Court,
    480 U.S. 102 (1987)                                   36

Beecham v. Socialist People's Libyan Arab Jamahiriya,
    424 F.3d 1109 (D.C. Cir. 2005)                      29,31,32

Bettis v. Islamic Republic of Iran,
    315 F.3d 325, 334-35 (D.C. Cir 2002).                29

Cicippio-Puleo v. Islamic Repbulic of Iran
    353 F.3d 1024 (D.C. Cir. 2004)                      28

Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya,
    2007 U.S.Dist. Lexis 49031, 06cv727(GK)(D.C.D. July 9, 2007)    26, 27, 28

International Shoe Co. v. Washington,
    326 U.S. 310 (1945).                             35, 36

Kilburn v. Socialist People's Libyan Arab Jamahiriya,
    376 F3d 1123, 1127 (D. __ Cir. 2004)              29, 31, 35

Murray v. The Charming Betsy,
    2 Cranch 64, 118 (1804)                         17, 19

Owens v. Republic of Sudan,
    374 F.Supp.2d 1, 14-16 (D.D.C. 2005)               33, 34

Persinger v. Islamic Republic of Iran,
    729 2d 835 (D.C. Cir. 1984),
    cert denied 469 U.S. 881 (1984)                      5

Phillips v. Heine,
    984 F.2d 489,492(D.C. Cir. 1993)                  27

Phoenix Consulting, Inc. v. Republic of Angola,
    216 F.3d 36, 40 (D.C. Cir. 2000).                  35

Price v. Socialist People's Libyan Arab Jamahiriya,

294 F.3d 82 (D.C. Cir. 2002)          33, 36, 38

R. v. Hape, 2007 SCC 26;  [2007]
      S.C.J. No. 26;  2007 Can. Sup. Ct. LEXIS 27 (June 7, 2007)          9

Schooner Exchange, v. M'Fadden,
      7 Cranch, at 137, 11 U.S. 116, 3 L.Ed. 286 (1812)          15

United States v.  Palestine Liberation Organization,
      695 F.supp. 1456, 1465 (S.D.N.Y. 1988)          17, 18

Vine v. Republic of Iraq,
      459 F.Supp.2d 10, 20-21 (D.C.D. 2006)          26, 27

Weinberger, Secretary of Defense, v. Rossi,
      456 U.S. 25, 32 (1982)          17,19

## Table of Other Authorities

Chapter I of the U.N. Charter          4, 15
      Article 1          4
      Article 2          4, 7,
            18
      Article 2.1          4, 13
      Article 2(2)          4
      Article 2.3          6

UN Headquarters Agreement
18,19

The Preamble of the Universal Declaration of Human Rights
      GA res 217A(III)1948       Article 1          7

International Covenant on Civil and Political Rights
      GA res 2200A(XXI)1976       Article 2(1)          7

Charter of the Organization of American States 1948          7
      119 UNTS 3       Article 1          7
            Article 3          7
            Article 9          7

Charter of the Organization of African Unity (1963)          7

479 UNTS 39

Convention on Rights and Duties of States     Montevideo Convention          8
    49 Stat 3097, Treaty Series 881

Constitution of the United States
    Article VI                                                                  9


Restatement of the Law (Third),
    Foreign Relations Law of the United States (ALI).
    sec. 454(a)                                                                 5


Export Administration Act of 1979                                              22


Foreign Assistance Act of 1961                                                 22


Anti-Terrorism Act of 1991
    Sec. 2331                                                                   1


Foreign Sovereign Immunities Act 28 U.S.C.                                     1
    §1602                                                                       1
    §1605                                                                       17, 18
    §1605(a) (1)-(6)                                                            15, 16
    §1605(a)(7)                                                                 Passum
    §1605(b)-(d)                                                                15
    §1605(e)                                                                    23
    §1605(f)                                                                    26, 27, 28
    §1605(g)                                                                    13
    §1606                                                                       36, 37
    §1608(a)(4)                                                                 3


D.C. Code §12-301 (2007)                                                       28


Fed.R.Civ.P. 12(b)(6)                                                          28


18 U.S.C.  §2339A(B)                                                           30


Fed.R.Civ.P. 54(b)                                                             2


8 U.S.C. §1189                                                                 23


Charter and the Statute of the International Court of Justice
    Article 2.3, Chapter VI                                                     19


Testimony of Jamison S. Borek, Deputy

Legal Advisor, Department of State, before
 the Senate Committee on the Judiciary,
Sub-Committee on the Courts and Administrative
Practice, considering Foreign Terrorism and U.S. Courts,
June 21, 1994, against enactment of S.825
concerning state-sponsored terrorism.                                      22

Testimony of William H. Taft, IV, Legal Advisor,
U.S. Department of State, Committee Hearing,
Senate Foreign Relations Committee,  Hearings on
Benefits for Victims of Terrorist Attacks, July 17, 2003.                  22

B. Kingsbury, Sovereignty and Inequality,
        9 European J. Int'l Law 599 (1998).                                 4

Declaration of Principles of International Law:
        Friendly Relations and Cooperation Among States in
        Accordance with the Charter of the United Nations.
        October 24, 1970. UNGA Res 2625 (XX_) 25 U.N.
        GAOR, Supp (No. 28) 121, U.N. Doc. A18028(1971).                    8

## Preliminary Statement

This memorandum is submitted by the Syrian Arab Republic defendants in support of their motion pursuant to Rule 12(b) to dismiss the claims against them for lack of subject matter jurisdiction, based on Syria's sovereign immunity and equal sovereignty and the absence of due process and fundamental fairness, for lack of personal jurisdiction, for failure to state a claim upon which relief can be granted and other grounds set forth below.

This case was originally filed in this Court on November 18, 2002, as 02cv2280(RJL). The original complaint sought money damages for injuries resulting from the detonation of an explosive device by a suicide bomber at a pizzeria in the West Bank of Palestine on February 16, 2002. This was at the height of violence during the second intifada which began in late September 2000. The original complaint named as defendants the Palestinian Authority and the Palestine Liberation Organization, sued under the Anti-Terrorism Act of 1991, 18 U.S.C. §2331 et seq., for allegedly planning and carrying out the bombing, and in conclusory allegations, the Syrian Arab Republic and several of its departments and officials, sued under the Foreign Sovereign Immunities Act, 28 U.S.C. §1602 et seq., for allegedly providing a wide range of general support for terrorism by the PA and PLO

On May 2, 2005 plaintiffs filed a Notice of Voluntary Dismissal dismissing the action against the Syrian defendants. The PA and PLO had earlier moved under Rule 12(b) to dismiss the action which the Court denied in a minute order on February 7, 2005.

No answer was thereafter filed by the PA and PLO and at plaintiffs request the Clerk entered the default of the PA and PLO on April 12, 2005.

A few days later, on April 15, 2005, Syria filed a Rule 12(b) motion to dismiss the

1

complaint.

This Rule 12(b) motion was pending unanswered when plaintiffs filed their May 2, 2005 notice of dismissal, and in light of the notice, the Court by minute order on January 25, 2006 <u>sua sponte</u> dismissed Syria's Rule 12(b) motion as moot.

Plaintiffs Notice of Dismissal anticipated that default judgment would soon be entered in their favor against the PA and PLO and stated that the dismissal was sought to avoid any delay in the entry of final judgment against the PA and PLO that might be required by Fed.R.Civ.P. 54(b) if other defendants remained in the case with claims pending against them.  The Notice concluded: "Plaintiffs will file a new action against the dismissed defendants shortly," and will identify the new action as related to the first.

Contrary to the Notice, the new complaint against the dismissed Syrian defendants was not filed "shortly."  It was filed just shy of a year later, on April 21, 2006, designated by plaintiffs as a related case, 06cv724(RJL).   Its allegations concerning the bombing at the pizzeria were virtually identical to those of the original complaint, except that the new complaint differed in seeking to impose liability upon the eight Syrian defendants other than Syria  in their personal capacity as well as their official capacity, unlike the original complaint which was limited to their official capacity.

The new April 2006 complaint  alleged an additional claim, entirely unrelated to the bombing at the pizzeria  – based on the fatal shooting of a settler while driving alone in the West Bank more than 15 years earlier, on March 26, 1991.  This new shooting claim added two plaintiffs, the driver's widow and a friend, alleged to have happened to drive up to the scene minutes after the shooting.

2

On December 7, 2006, Syria filed a Rule 12(b) motion to dismiss the new complaint based on defects in the service of process plaintiffs had purported to make by diplomatic note from the U.S. Embassy pursuant to FSIA §1608(a)(4).   Plaintiffs re-served the complaint.

On August 27,  2007, Syria filed a Rule 12(b) motion to dismiss the April 2006 complaint.          On October 24, 2007,  plaintiffs filed a First Amended Complaint which did not add any new claims or parties (hereinafter "the complaint" unless otherwise noted) to which this motion is addressed.

At the outset of this case, after it was filed in November 2002, the undersigned attorneys appeared as counsel for all defendants.  In May 2007 the PA and PLO retained new counsel for this case and others in the U.S.   New counsel appeared in case 02cv2280(RJL) for the PA and PLO.  With leave of the Court, the undersigned then formally withdrew from representation of the PA and PLO in that case,  and their representation of the Syrian defendants continued in case 06cv724(RJL).

We understand that no service has been accomplished on the five Syrian defendants who are individuals, and dismissal of the case against them is appropriate and is  requested by defendants on this motion.


## Argument

**I.    Article 2 Of The United Nations Charter Requires All Members To Act In Accordance With the Principle of Sovereign Equality On Which The U.N. Is Based And to Fulfill In Good Faith Their Obligation To Ensure The Sovereign Equality Of Each Member**

3

A.      **FSIA §1605(a)(7), as applied, Violates the Sovereign Equality and the Juridical Equality of the Syrian Arab Republic and the Obligation of the U.N. to Ensure the Sovereign Equality of all U.N. Members by Seeking to Subject the Syrian Arab Republic to the Coercive Power of U.S. Courts for Alleged Acts of State While Recognizing the Sovereign Immunity of Nearly all Other U.N. Members for All Four Acts Stated in §1605(a)(7)**

Chapter I of the U.N. Charter, entitled "Purposes and Principles", contains only two articles.

Article 1 declares "The purposes of the U.N. are:

"1.  To maintain international peace and security...
"2   To develop friendly relations among nations...
"3   To achieve international co-operation...
"4   To be a center for harmonizing the actions of nations..."

Article 2 declares the Principles of the U.N.  It begins

"The Organization and its Members, in Pursuit of the Purposes stated in Article 1, shall act          in accordance with the following Principles.

"1.  The Organization is based on the principle of the sovereign equality of all its Members.

"2.  All Members, in order to ensure to all of them the rights and benefits resulting from membership, shall fulfill in good faith the obligations assumed by them in accordance with the present Charter."

By the time of the drafting of the U.N. Charter, its first principle – the sovereign equality of all its Members – was an axiom of international law.   B. Kingsbury, <u>Sovereignty and Inequality</u>, 9 European J. Int'l Law 599 (1998).

To remove any doubt that all U.N. Members are bound to honor the Principle of Sovereignty Equality on which the U.N. is based, the first sentence of Article 2 directs that Members of the U.N. "...shall act in accordance with the following Principles" and Article 2(2) which immediately follows Article 2(1) directs that all Members "...shall fulfill in good faith the obligations assumed by them in accordance with the present Charter."

4

The attempted exercise of judicial power by one sovereign over the body politic, ministries, agencies, or officials of another sovereign for governmental activity within its own territory, or elsewhere outside the territory of the sovereign seeking to coerce it by the exercise of judicial power, is a direct assault upon the sovereignty of that government and where exercised selectively violates the principles of sovereign equality and juridical equality protected by the U.N. Charter, U.N. declarations, other treaties and by customary international law.

The threat or use of judicial power to compel conduct, such as the surrender of government documents, the compulsion of testimony from government officials or personnel, or seizure of official papers, or property of a foreign sovereign nation in connection with acts of that foreign sovereign within its own country, or elsewhere outside the territory of the sovereign seeking to employ such force is a violation of its sovereignty.

For more than two centuries, until the 1996 amendments to the FSIA, the U.S. recognized the sovereign equality of nations and refused to exercise jurisdiction over foreign states for violence and other tortious acts where death or injury resulted outside the U.S.  See, sec. 454(a) Restatement of the Law (Third), the Foreign Relations Law of the United States (ALI).  A painful and humiliating example involved the U.S. Embassy personnel forcibly held in Tehran in the history changing hostage crisis of 1979-81.  They were denied relief on claims against Iran brought in U.S. courts because Iran had sovereign immunity.  See Persinger v. Islamic Republic of Iran, 729 2d 835 (D.C. Cir. 1984), cert denied 469 U.S. 881 (1984).

The denial of sovereign immunity to a few selected nations is a hostile act and can be extremely costly and provocative.  To be hailed into a foreign court for alleged governmental acts on a nation's own soil, or elsewhere outside the territory of the demanding government is to

5

submit to the supremacy of another sovereign for acts in other parts of the world on the soil of other sovereigns and forced to provide testimony by high officials, surrender and expose state secrets and forfeit hundreds of millions even billions of dollars however impoverished its own citizens may be.  The enormous judgments entered by U.S. courts in cases against selected sovereign nations including impoverished peoples are beyond imagination elsewhere in the world and further inflame anti American passions.  They invite retaliation and response in kind.  The Department of State, whose employees were held hostage in Tehran, has often vigorously opposed such violations of sovereign immunity, if selectively,  as contrary to important foreign policy interests of the U.S.

The equal sovereignty of every nation is the necessary and rightful foundation of the law of nations.  No other standard could achieve the acceptance of all nations to the mandate of international law.

Such selective denials of equal sovereignty also violate the third principle of the U.N. that "All Members shall settle their international disputes by peaceful means in such a manner that international peace and security, and justice, are not endangered." Article 2.3, U.N. Charter.

The moral force and legal assurance of the equal sovereignty of nations is as compelling for peaceful relations among nations as the principle of the equality of every person is to the protection of the human rights of individuals.  Equal sovereignty is the foundation for relations among States just as the equality in dignity and rights of individuals are the foundation for the relations between the State and the individual.

The Preamble of the Universal Declaration of Human Rights, G.A. res. 217(A)(III)1948, begins "Whereas recognition of the inherent dignity and the equal and inalienable rights of all

members of the human family is the foundation of freedom, justice and peace in the world."
Article 1 of the Declaration declares "All human beings are born free and equal in dignity and rights."

Article 2(1) of the International Covenant on Civil and Political Rights, G.A. res. 2200A(XXI) 1976, to which the United States is a Party proclaims

"Each State Party to the present Covenant undertakes to respect and to insure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status."

The principles of the U.N. Charter, like those of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights are woven into the fabric of international law, including treaties, agreements, the charters and acts of international organizations and customary law.

The Charter of the Organization of American States, 1948, 119 U.N.T.S. 3, amended 721 U.N.T.S. 324, which the United States has ratified and is a Member, proclaims itself "a regional agency", "Within the United Nations". Article 1. In Article 3, it provides "The American States reaffirm the following principles:

(a) International law is the standard of conduct of States in their reciprocal relations;

(b) International order consists essentially of respect for the personality, sovereignty, and independence of States, and the faithful fulfillment of obligations derived from treaties and other sources of international law..."

Article 9 of the OAS Charter provides,

"States are juridically equal, enjoy equal rights and equal capacity to exercise these rights

7

and have equal duties..."

The Charter of the Organization of African Unity, 479 U.N.T.S. 39 (1963), states the first principle of the organization in language similar to that of the Charter of the United Nations "Art. III(1) The sovereign equality of all Member States."

The Convention on Rights and Duties of States, the "Montevideo Convention" which entered into force for the U.S. on December 26, 1934, 49 Stat. 3097, Treaty Series 881, provides: "States are juridically equal, enjoy the same rights and have equal capacity in their exercise.   The rights of each one does not depend on the power which it possesses ... but upon the simple fact of its existence as a person under international law."   More than a decade before the U.N. Charter was drafted, the United States agreed that all states possess equal rights, equality in the exercise of these rights, equal juridical power and status and equality under the law and in the Courts of other states.

The Declaration of Principles of International Law concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations.  October 24, 1970. UNGA Res 2625 (XX_) 25 U.N. GAOR, Supp (No. 28) 121, U.N. Doc. A18028(1971).

"1. Solemnly proclaims the following principles...

"The principle of sovereign equality of States,

"All States enjoy sovereign equality.  They have equal rights and duties and are equal members of the international community, notwithstanding differences of an economic, social, political, or other nature.

"In particular, sovereign equality includes the following elements:
"(a) States are juridically equal;
"(b) Each State enjoys the rights inherent in full sovereignty;
"(c) Each State has the duty to respect the personality of other States."

The Supreme Court of Canada addressed the issue of sovereign equality and related principles in a recent case involving material seized in a search and seizure in the Turks and Caicos Islands of the office of a Canadian citizen on trial in Canada and determined that the laws of the foreign sovereign controlled admissibility of the evidence seized on principles of sovereign equality.  R. v. Hape, 2007 SCC 26;  [2007] S.C.J. No. 26;  2007 Can. Sup. Ct. LEXIS 27 (June 7, 2007).  The decision confirms and exemplifies the fundamental  importance and vitality today of the principles of sovereign equality:    The Court in Hape stated:

> (2) Principle of Respect for Sovereignty of Foreign States as a Part of Customary
>  International Law and of Canadian Common Law
>
> 40. One of the key customary principles of international law, and one that is central to the legitimacy of claims to extraterritorial jurisdiction, is respect for the sovereignty of foreign states. That respect is dictated by the maxim, lying at the heart of the international legal structure, that all states are sovereign and equal. Article 2(1) of the Charter of the United Nations, Can. T.S. 1945 No. 7, recognizes as one of that organization's principles the "sovereign equality of all its Members". The importance and centrality of the principle of sovereign equality was reaffirmed by the General Assembly in the 1970 Declaration on Principles of International Law concerning Friendly Relations and Co-operation among States in accordance with the Charter of the United Nations, GA Res. 2625 (XXV), 24 October 1970, which expanded the scope of application of the principle to include non-U.N. member states. A renowned international law jurist, Antonio Cassese, writes that of the various principles recognized in the U.N. Charter and the 1970 Declaration:
>
> [T]his is unquestionably the only one on which there is unqualified agreement and which has the support of all groups of States, regardless of ideologies, political leanings, and circumstances. It is safe to conclude that sovereign equality constitutes the linchpin of the whole body of international legal standards, the fundamental premise on which all international relations rest.
>
> See A. Cassese, International Law (2nd ed. 2005), at p. 48.
>
> *                    *                    *
>
> 45. In order to preserve sovereignty and equality, the rights and powers

9

of all states carry correlative duties, at the apex of which sits the principle of non-intervention.... This principle of non-intervention is inseparable from the concept of sovereign equality and from the right of each state to operate in its territory with no restrictions other than those existing under international law. ...

46. Sovereign equality remains a cornerstone of the international legal system. Its foundational principles -- including non-intervention and respect for the territorial sovereignty of foreign states -- cannot be regarded as anything less than firmly established rules of customary international law, ... Every principle of customary international law is binding on all states unless superseded by another custom or by a rule set out in an international treaty. As a result, the principles of non-intervention and territorial sovereignty may be adopted into the common law of Canada in the absence of conflicting legislation. These principles must also be drawn upon in determining the scope of extraterritorial application of the Charter.

              *                     *                   *

(4) Conformity with International Law as an Interpretive Principle of Domestic Law

53. One final general principle bears on the resolution of the legal issues in this appeal. It is a well-established principle of statutory interpretation that legislation will be presumed to conform to international law. The presumption of conformity is based on the rule of judicial policy that, as a matter of law, courts will strive to avoid constructions of domestic law pursuant to which the state would be in violation of its international obligations, unless the wording of the statute clearly compels that result. R. Sullivan, Sullivan and Driedger on the Construction of Statutes (4th ed. 2002), at p. 422, explains that the presumption has two aspects. First, the legislature is presumed to act in compliance with Canada's obligations as a signatory of international treaties and as a member of the international community. In deciding between possible interpretations, courts will avoid a construction that would place Canada in breach of those obligations. The second aspect is that the legislature is presumed to comply with the values and principles of customary and conventional international law. Those values and principles form part of the context in which statutes are enacted, and courts will therefore prefer a construction that reflects them. The presumption is rebuttable, however. Parliamentary sovereignty requires courts to give effect to a statute that **[*830]** demonstrates an unequivocal legislative intent to default on an international obligation. See also P.-A. Cote, The Interpretation of Legislation in Canada (3rd ed. 2000), at pp. 367-68.

54. The presumption of conformity has been accepted and applied by

10

this Court on numerous occasions....

The United States and the Syrian Arab Republic have both ratified the U.N. Charter and been accepted as Members of the United Nations.  Both the U.S. and the Syrian Arab Republic are bound by the Charter of the United Nations, the most universally accepted and important treaty among nations, which embodies humanity's best chance for peace.  Both the United States and the Syrian Arab Republic have committed themselves to faithfully observe the principle of the sovereign equality of all U.N. Members, the foundation on which the United Nations stands, which is essential to the fulfillment of all its purposes.

The unilateral, arbitrary and discriminatory act of the United States seeking to strip the Syrian Arab Republic of its equal sovereignty by denying it immunity from claims brought against it in Courts of the United States, based on an arbitrary, unilateral, discriminatory and secret executive proclamation of the U.S. Secretary of State on unknown evidence, if any, violates the duties of the United States to honor the sovereign equality of all U.N. Members under the United Nations Charter, a treaty that is a part of the "supreme Law of the Land". Article VI, second paragraph, Constitution of the United States.

The issue must be of special concern to the judiciary, because it has been made the principal instrument for the violation of the First Principle of the United Nations.    The federal courts will lose a part of their judicial sovereignty, or independence and be complicit in a process in violation of international law and the Constitution that created them, if they fail to address the Syrian Arab Republic's right to equal sovereignty including juridical equality under the U.N. Charter.

11

The Charter means only to insure the equality of sovereignty for all its Members so that all will be treated equally as to their sovereignty and cannot take offense that the U.N. itself, or one, or more of its Members are discriminating against it by denying it equal sovereignty. Only on the foundation of sovereign equality can the U.N. function with respect for the equal rights, personality and dignity of each Member.

The violation of the Syrian Arab Republic's sovereign equality by the United States through its Courts by seeking to authorize the exercise of jurisdiction over the Syrian Arab Republic on the facts alleged in the complaint in this case is undeniable. Of the near 200 Members of the United Nations only a handful have ever been designated state sponsors of terrorism by the Secretary of State of the United States without notice, or an opportunity to respond and present their insistence on respect for their sovereign equality. The Syrian Arab Republic by force of the U.S. Secretary's designation is threatened with the deprivation of its fundamental rights of equal sovereignty, which include immunity from coercion by the courts of a foreign nation for governmental acts alleged, as here, to have occurred within the Syrian Arab Republic's own borders and at locations in the West Bank of Palestine.

The Syrian Arab Republic is thus threatened by this lawsuit with the deprivation of an essential element of its equal sovereignty, its subjugation to the power of U.S. Courts for sovereign acts alleged to have been committed in its own and neighboring territory, while virtually all other Members of the United Nations remain immune. Under FSIA §1605(a)(7) the Courts of the U.S. "Shall decline to hear a claim" against states that are among the 190, or so, that have not been selectively designated. The Congress has proclaimed for the Courts of the United States, this extraordinary worldwide extra territorial jurisdiction over sovereigns the U.S.

12

arbitrarily selects to subject to the coercive power of U. S. Courts in violation of their rights to sovereign equality.

It is only equality of sovereignty that must be respected. All Members must respect the sovereignty of all other Members equally. As applied to the Syrian Arab Republic, but not to the vast majority of U.N. Members, FSIA §1605(a)(7) violates the Syrian Arab Repbulic's right of sovereign equality and the U.S. obligation to honor the Syrian Arab Republic's sovereign equality.

If FSIA §1605(a)(7) were applied equally to all U.N. Members Art. 2.1 of the U.N. Charter will not be violated.

Few acts of state impinge more directly on the sovereignty of another state than seeking selectively to subject a sovereign to physical coercion in a foreign Court to adjudicate its conduct, compel testimony from its officials, even a head of State, or government, the production of confidential government documents, impose judgment on its acts, and inflict penalties.

That denial of sovereign immunity by §1605 impacts on matters of State is conceded by §1605(g) which provides the U.S. Attorney General can obtain a stay of any request, or order for discovery on the United States by certifying it would interfere with a criminal investigation, or case, or a national security operation, create a serious threat of death, or bodily injury, or adversely affect the ability of the U.S. to work with other sovereigns, or international law enforcement agencies in investigating violations of U.S. law. We can be sure the U.S. executive would refuse to release any U.S. State Secrets to any court. This denial of sovereign and juridical equality, is a grave breach of the U.N. Charter, second only, perhaps, to violent aggression.

It is demeaning and an assault on the independence, dignity and honor of a sovereign and intrudes on its sovereign conduct to be subjected to foreign judicial power and judgments over its acts of state selectively.  It is a form of war by other means because it seeks to coerce an equal sovereign, order its executives, compel their testimony, force disclosure of state secrets, seize its property, impose draconian penalties.   Where it singles out nations on an arbitrary, secret, unchallengeable basis determined by the highest foreign policy officials of an equal sovereign, it will destroy friendly relations, cooperation and harmony between nations and brand the Member unequal, inferior.

Sovereign immunity is a major attribute of sovereignty.  The recognition of sovereign immunity among nations, as distinguished from sovereign immunity of a government from suits in its own courts by its own people, or others, does not mean or imply that the King can do no wrong.  Among states it means we recognize your equal sovereignty and that we have no right to selectively intrude on it.

The unequal denial of sovereign immunity is a direct assault on sovereign equality and juridical equality.  Only military aggression by one sovereign against another exceeds the intrusion on sovereignty of the exercise of judicial power to coerce an equal sovereign for its exercise of governmental functions.

As best defendants have been able to determine, the FSIA provisions which authorize the selective denial of sovereign immunity to a few nations are unique.  We have found no other system of sovereign immunity by convention or treaty or statute or otherwise  that allows the denial of sovereign immunity on the basis of such political selectivity.  Not surprisingly these provisions are exercised by the U.S. against disfavored nations.  There is even a federal

14

regulation which defines "friendly foreign government" to mean "Any government with whom

the United States has diplomatic relations and whom the United States has not identified as a

state sponsor of terrorism." 27 CFR 478.11 Meaning of Terms.

International law has always and necessarily been based on the equality of sovereigns.

Chief Justice John Marshall spoke eloquently of the principle in the seminal case of the French

Schooner Exchange, which had taken refuge in the port of Philadelphia.   Marshall explained the

supremacy of each sovereign over its own soil and the waiver by every sovereign of a part of its

exclusive territorial jurisdiction, as follows:

> "Th[e] perfect equality and absolute independence of sovereigns, and th[e] common
> interest impelling them to mutual intercourse, and an interchange of good offices with
> each other, have given rise to a class of cases in which every sovereign is understood to
> wave the exercise of a part of that complete exclusive territorial jurisdiction, which has
> been stated to be the attribute of every nation." Schooner Exchange, v. M'Fadden, 7
> Cranch, at 137, 11 U.S. 116, 3 L.Ed. 286 (1812)

Even on its own soil, though it possesses exclusive sovereignty, every U.N. Member must

respect the sovereign equality and juridical equality of all Members of the U.N.

No other Member of the U.N. has claimed worldwide extra territorial jurisdiction for its

courts over sovereigns it selects.

Congress recognized the principle of Equal Sovereignty in the FSIA.   The sovereign

equality of foreign states are not violated by the denial of immunity and consequent exercise of

jurisdiction by U.S. courts in FSIA §1605(a) 1-6, or 1605(b)-(d) which address mainly

commercial activities, because they apply equally to all sovereigns and international law does not

recognize sovereign immunity under the circumstances described therein.  See FSIA §1605,

Findings and Declaration of Purpose.  ("Under international law, states are not immune from the

15

jurisdiction of foreign courts insofar as their commercial activities are concerned..." stating other recognized exceptions.)

Except for §1605(a)(7), the Foreign Sovereign Immunities Act treats foreign sovereigns equally,  recognizing their sovereign and juridical equality as required by the U.N. Charter. §1605(a) provides that a "foreign state shall not be immune from the jurisdiction of Courts of the United States or of the States" in any case specified in the section. §1605(a) (1)-(6) dealing generally with cases of waiver of immunity; commercial activity in the United States; property in the United States; personal injury, or death in the United States caused by tortious acts of a foreign state; in effect, codifying the restrictive recognition of sovereign immunity. §1605(b)-(d) deny immunity in admiralty, maritime liens and ship Mortgage cases where nations share jurisdiction.  In all these provisions, FSIA §1605(a)(1)-(6) and §1605(b)-(d), all foreign sovereigns are treated equally.

§1605(a)(7) initially refers equally to all foreign sovereigns denying all nations immunity "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ...for such an act" if engaged in by an official, employee, or agent of a foreign state acting within the scope of his or her authority.  It then violates the principle of sovereign equality by providing  "...except that the court shall decline to hear a claim under this paragraph – (A) if the foreign state was not designated as a state sponsor of terrorism", further providing "unless later so designated as a result of such act or the act is related to Case Number 1:00 CV 03110(EGS)" in the District Court for the District of Columbia.  The last provision is a dubious and infortunate intrusion by Congress into a case under adjudication in a U.S. Court.

16

FSIA 1605(a)(7)(A) is a discriminatory limitation of jurisdiction, achieved by double negative, to the handful of foreign sovereigns that the Secretary of State has designated as a state sponsor of terrorism that egregiously violates the duty of the United States to ensure the sovereign equality, including the juridical equality, of all U.N. Members.  Only the chosen few are treated in violation of their equal sovereignty and juridical equality.  Nor is it clear why the Congress and the Executive would so favor, among all foreign sovereigns, only those few it selects to subject to U.S. Court jurisdiction for acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support for such acts.  Are not such offenses equally grievous whoever the perpetrator?

### B. Congress Did Not Intend to Violate the First Principle of the U.N. Charter – The Sovereign Equality of Nations by Enacting the FSIA Provisions

Only by a law enacted by the Congress that clearly states the intention of Congress to revoke or modify a provision of a treaty entered into by the United States, can a treaty, or any of its provisions, be rescinded

"It has been a maxim of statutory construction since the decision in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804), that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...'" .  Weinberger, Secretary of Defense, v. Rossi, 456 U.S. 25, 32 (1982).  See also, United States v. Palestine Liberation Organization, 695 F.Supp. 1456, 1465 (S.D.N.Y. 1988).

The Congress was aware that issues of sovereign immunity were directly and importantly related to friendly, cooperative and harmonious foreign relations and were dealt with in many treaties and agreements.  Congress therefore provided in the Foreign Sovereign Immunities Act

17

of 1976, that its provisions were "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act..." 28 U.S.C. §1604. This provision subjects the FSIA to the provisions of the U.N. Charter, above all international agreements, and prohibits the violation of equal sovereignty and juridical equality.

Thus, the FSIA affirmatively recognizes that the provisions of the U.N. Charter are controlling, where violated by the FSIA. §1604 demonstrates that Congress was aware that international agreements might be in conflict with provisions of the FSIA. It did not intend to revoke any international agreements in part, or whole, but subjected the FSIA to all existing international agreements

Further, in the proceedings leading to the enactment of Section 1605(a)(7) Congress did not reveal any consideration of U.S. obligations under the Charter of the United Nations, or its first principle set forth in Chapter I, Article 2, paragraph 1, much less an intention to renounce those obligations. In FSIA §1604, Congress states its intention to abide by the provisions of the U.N. Charter. The FSIA cannot therefore be construed to revoke the treaty agreement by the United States in the Charter of the United Nations to respect the sovereign equality of all U.N. Members.

Nothing in the words of the FSIA, its §1605(a)(7), or the legislative history of their enactment implies that Congress intended to violate the first principle of the Charter of the United Nations: "...the sovereign equality of all its Members." It is unlikely that the Congress of the United States would ever do so.

In the legislative history and the Act that gave rise to U.S. v. PLO, supra, 695 F.Supp. 1456, Congress made explicit its intention to close the Permanent Observer Mission of the PLO

18

to the United Nations, as well as bar the PLO from any presence in the U.S.  The Congress made

no reference, however, to the United Nations Headquarters Agreement, a treaty between the U.N.

and the U.S.

     The legislation and case arose at an extremely emotional and heated time in the Middle

East and high U.S. hostility toward the PLO.

     The District Court reviewed the Headquarters Agreement, determined that Congress had

violated its protection of U.N. invitees to the U.N. Headquarters in New York, found further that

Congress had not manifested an intent to violate the Headquarters Agreement and dismissed the

complaint of the United States seeking closure and removal of the Mission from the U.S. on the

authority of the <u>Charming Betsy</u> and <u>Weinberger, Secretary of Defense</u> cases cited above.

     The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts".

<u>Argentine Republic</u> v. <u>Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 434 (1989).  If Congress

chooses to authorize other claims against foreign sovereigns in U.S. Courts, such as violations of

<u>jus cogens</u>, in addition to those described in §1605(a)(7), it will have to amend the FSIA and treat

sovereigns equally.

     The Charter of the United Nations requires and contemplates that its Members will settle

disputes and resolve problems between and among them peacefully without resort to force, or the

threat of force, by diplomacy, negotiations, mediation, conciliation, arbitration, other agreements,

or with regional organizations or through the services of the Security Council, the General

Assembly, the Secretariat of the U.N. or the International Court of Justice.  See, e.g. Article 2.3,

Chapter VI of the Charter and the Statute of the International Court of Justice.

     For a Member of the U.N. to attempt to directly subject another Member to the

jurisdiction and power of its domestic courts in violation of the U.N. Charter and international law is a threat to use force against it, a serious provocation and a clear violation of the Sovereign Equality of that Member.

C.  **Designations under Section 1605(a)(7) by Violating the Equal Sovereignty of U.N. Members Designated State Sponsors of Terrorism Have Seriously Impaired Efforts to End of the Scourge of War, Harmed the Peoples of the United Nations, Damaged the United States in the Conduct of Its Foreign Relations and Assaulted the Foreign States it has Unilaterally Labeled Terrorist and Attempted to Selectively Hold Subject to the Jurisdiction of U.S. Courts**

§1605(a)(7) of the Foreign Sovereign Immunities Act of 1976, an amendment to the Act in 1996, seeks to confer unprecedented extraterritorial jurisdiction on the Courts of the United States.  Here, the Court is asked to adjudicate alleged activity of the government of the Syrian Arab Republic in Syria over a period of years and in the West Bank of Palestine.

The Syrian Arab Republic is a foreign sovereign state.   §1605(a)(7) seeks to deny the Syrian Arab Republic its sovereign equality and subject it to the power of the U.S. courts based on arbitrary, secret, unchallengeable and discriminatory findings of the U.S. Secretary of State. The vast majority of U.N. Members are not equally threatened with such an assault on their sovereignty.

No other nation seeks to exercise such far reaching and arbitrary jurisdiction over other U.N. Members through its courts in violation of the Charter of the United Nations and customary international law.  If other nations sought to exercise such extraterritorial jurisdiction through their courts, finding facts from events on foreign soil, proclaiming draconian penalties against foreign sovereigns and seeking execution on sovereign properties worldwide, chaos would result.

Other nations will in time, retaliate against the U.S. by seeking to exercise judicial power over it creating greater international tensions and injury if the U.S. continues its practice.

§1605(a)(7) is ill designed, even if it were permissible under international law, as a means to fairly and equally compensate victims of violent government crime.  The plaintiffs, a minuscule number among thousands of victims, are individuals, self selected, represented by private attorneys.  Either the victim or the claimant must be a U.S.  National.  The vast majority of victims of terrorist acts by government will never be able to seek compensation in U.S. courts.  Aliens equally injured, or worse, are excluded under the Act.

The identical criminal conduct alleged here, if committed by any of the more than 190 Members of the U.N., or their officials,  including the U.S., not designated a state sponsor of terrorism can not be addressed in U.S. courts.  Nor can nationals of a state designated a sponsor of terrorism by the U.S. sue the U.S., or any other nation that may have inflicted equally, or greater injuries or death on them because of sovereign immunity, compounding the denial of equal justice under law.

The cumulative magnitude of claims brought against foreign sovereigns under §1605(a)(7) can become immense.  Awards exceeding billions of dollars have been entered by U.S. courts against foreign sovereigns designated under §1605(a)(7).   Other defendants in similar cases face greater claims.

Efforts to obtain sensitive government documents and depose heads of government in these cases have resulted in default judgments.  A sovereign state can not often submit to intrusive discovery, the deposition of heads of state, high officials, demands for documents affecting their security, state secrets, confidential foreign relations with other nations and

21

organizations at the behest of private individuals in foreign countries who may have political motives.

In the several cases brought against the Syrian Arab Republic under §1605(a)(7), it risks assessment of billions of dollars in damages to be determined by U.S. courts whose language, rules and procedures are foreign, invoke American standards of compensation for wrongful death and physical injury of U.S. citizens alone which involve amounts unimaginable in the Syrian Arab Republic, or the Arab world.

These cases appear to be an assault on Islam and the Arab world from the perspective of Arab and predominantly Muslim defendants.

Such proceedings are overreaching by the U.S. They are prosecuted by private parties not concerned with U.S. interests, or peaceful foreign relations. They are inherently unjust. They fail to consider and compensate the vast majority of wrongful deaths and injuries which occur which involve non U.S. citizens and cause serious tensions between the United States and other nations.

Opposition to the legislation was forcefully stated by the U.S. Department of State in hearings preceding enactment of §1605(a)(7). See, e.g. Testimony of Jamison S. Borek, Deputy Legal Advisor, Department of State, before the Senate Committee on the Judiciary, Sub-Committee on the Courts and Administrative Practice, considering Foreign Terrorism and U.S. Courts, June 21, 1994, against enactment of S.825 concerning state-sponsored terrorism. See also the recommendations for compensation for victims of terrorism in the Testimony of William H. Taft, IV, Legal Advisor, U.S. Department of State, Committee Hearing, Senate Foreign Relations Committee, Hearings on Benefits for Victims of Terrorist Attacks, July 17, 2003. The

U.S. has since, again selectively, filed Statements of Interest seeking dismissal of claims.

**D.  The Power of the U.S. Secretary of State under FSIA §1605(a)(7) to Designate a Foreign State a Sponsor of Terrorism and the Procedures Followed are Lawless and Antithetical to the Rule of Law**

There are no criteria or procedural requirements for the Secretary's imposition or continuance of the designation of a state as a "sponsor" of terrorism.

Both of the statutes cited in §1605(a)(7) (A) as the source of the designation "state sponsor of terrorism," the Export Administration Act of 1979 and the Foreign Assistance Act of 1961 provide for a determination by the Secretary in the same language, that "the government of such country" has "repeatedly provided support for acts of international terrorism."  Neither statute speaks of sponsorship or calls upon the Secretary to designate the state as a sponsor of terrorism.  This determination contemplated by these two statutes and authorized for different purposes,  is different from a designation as a state sponsor of terrorism.  It may seem roughly equivalent but there are important differences in meaning.  That §1605(a)(7) equates the determination in these two statutes with a designation that a state is a sponsor of terrorism significantly illustrates the arbitrary nature of the Secretary's actions under §1605(a)(7).

§1605(a)(7) contains no definition of "terrorism" or "sponsor of terrorism", despite other definitions proved in §1605(e),  for the Secretary to employ in making a designation under the section.  No notice is given to the state.  There is no hearing or record compiled.  No formal decision or informal explanation whatsoever is required of the Secretary.  There is no provision for administrative or judicial review of the designation's imposition or continuance.  No attempt, even a feeble one, at due process or fundamental fairness is required by the statute.   No identification or findings are required with respect to the nature and extent of the state's

23

purported terrorism .   And on this basis, a foreign nation is deprived of its equal sovereignty before U.S. courts.

The procedural and other requirements imposed by 8 U.S.C. §1189, which authorizes the Secretary of State to designate an organization as a "foreign terrorist organization," meager as they are, stand in sharp contrast to the completely unfettered, unstructured, unreviewable power §1605(a)(7) allows the Secretary in designating foreign states as sponsors of terrorism.

Designation under §1605(a)(7) has been essentially political.  Few states are selected and all states selected are consistently treated in various ways by the executive and legislative branches as enemies of the United States.  The designation as a sponsor of terrorism is obviously one that has not been imposed on a friendly nation, no matter how openly heinous or terrorist its conduct has been.

The determination that a state is a "sponsor" of terrorism under §1605(a)(7) apart from imposing upon the state an exception to equal sovereignty that deprives it of sovereign immunity has no function or meaningful significance in the operation or application of the statute.

The Secretary's designation has no function other than to identify the states that can be deprived of their sovereignty.  There is no requirement that there be any causal or other relationship between the basis for the designation of a state as a sponsor of terrorism and the terrorism alleged in a law suit.

It's noteworthy that while causation must be shown for purposes of jurisdiction and liability under §1605(a)(7)  – that one of the four acts of terrorism listed in the section or support for the act has occurred, the Secretary is free of any such requirement in making her designation.

The absence of any requirement that there must be a connection between the basis for a

24

designation by the Secretary and any action filed against such a state in a U.S. court is added confirmation of Congress' expectation and indifference to the probable use of §1605(a)(7) solely against disfavored or enemy states and not against friendly nations.

**E. The Syrian Arab Republic has Responded in this Case as a Courtesy to the United States Hoping that by Reasoning Together in U.S. Courts this Harmful and Unlawful Practice can be Ended and a Step Toward Better Relations Taken.**

The Syrian Arab Republic has responded to this lawsuit brought against it in U.S. Courts by private parties under §1605(a)(7) solely to contest U.S. jurisdiction over it as a sovereign equal as a matter of courtesy to the United States.  Non appearance can result in default judgments that strain relations and create friction and difficulties between  nations that may take years to resolve and tensions that can lead to conflict.  It is better to consider and resolve any jurisdictional questions at the threshold and avoid protracted conflict and tension with the United States.   It is hoped that by reasoning together it can be agreed that the statute under which this case is brought violates the Charter of the United Nations.

It is helpful to consider that other nations may have different opinions about which nations are sponsors of terrorism.  The United States itself provides vast military aid, police training, observers, personnel, intelligence and motivation to the use of force to scores of nations frequently accused of terrorist acts and human rights violations, including in the Middle East area alone, Egypt, Israel, Pakistan, Saudi Arabia, and both the former and present governments of Iraq and Afghanistan.   Nations whose citizens are victims of violence by such nations may decide to authorize suits against the U.S. as a sponsor of terrorism and responsible for their deaths and injuries.

25

For any nation to unilaterally assume authority to deprive another nation of its equal sovereignty by selectively authorizing suit against it for acts occurring on its own soil, or in its part of the world and seek to assert its judicial power over that nation where international law prohibits such use of judicial power, threatens the breakdown of international law and the ability of the United Nations to pursue its purposes, including containment of the scourge of war.  Such designations of state sponsors of terrorism are arbitrary, inherently political, made against selected "enemies" – the evil empires – and will create international hostility and tensions, inviting worldwide retaliation, crippling the capacity of the United Nations and international law to end the scourge of war.

**II.  The claims of plaintiffs Miller and Zahav based on an alleged shooting attack on March 26,1991 are untimely under FSIA §1605(f) and are barred by Syria's sovereign immunity.**

§1605(f) was recently held by this Court to bar as untimely claims being asserted under §1605(a)(7),  Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya, 2007 U.S.Dist. Lexis 49031, 06cv727(GK)(D.C.D. July 9, 2007).  Buonocore followed this Court's earlier analysis in Vine v. Republic of Iraq, 459 F.Supp.2d 10, 20-21 (D.C.D. 2006) (HHK).  These two cases compel the conclusion that the claims based on the shooting attack on March 26, 1991,, asserted for the first time in the complaint in this action filed on April 21, 2006, are time-barred under §1605(f).

§1605(f) is as follows:

> (f) No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

26

Under §1605(f), plaintiffs' claims based on the shooting attack arose on March 26, 1991, the day of the alleged attack.   See Complaint, para. 50.   At that time Syria's sovereign immunity barred the assertion against it of claims based on the attack..

The jurisdiction of this Court to adjudicate claims against Syria based on the shooting attack began on April 24, 1996, the effective date of the amendments that added §1605(a)(7) and related provisions, including §1605(f), to the FSIA.

The ten-year period §1605(f) provides began in this case on March 26, 1991 and ended on March 25, 2001.   Claims based on the shooting attack could have been asserted in this Court from April 24, 1996 to March  25, 2001.   The claims could have been filed in this Court at any time during the five years prior to the expiration date of March 25, 2001.   This is of decisive importance for equitable tolling purposes.   The claims were not filed until April 21, 2006, a delay of more than five years after time expired under §1605(f), and more than 15 years after the shooting..   Since for all that appears the claims could readily have been filed during the five year period prior to March 25, 2001, no principle of equitable tolling further extends the time for filing.   The controlling principle of equitable tolling is stated in Phillips v. Heine, 984 F.2d 489,492(D.C. Cir. 1993):

> [Equitable tolling] gives the plaintiff extra time *only* if he needs it. "If [the plaintiff] doesn't need it there is no basis for depriving the defendant of the protection of the  **[\*\*9]**  statute of limitations", *id.,* which after all exists to advance important interests in evidentiary accuracy and repose. The purposes of the doctrine are fully achieved if the court extends the time for filing by a reasonable period after the tolling circumstance ended.(citation omitted)

Both Buonocore and Vine reject the argument that §1605(f) gives every plaintiff in a §1605(a)(7) case 10 years from April 24, 1996, to file his claims in this Court.   This reading

27

of §1605(f) fails because it leaves no room for the equitable tolling the statute contemplates -- that the Court will exercise its discretion and judgment with respect to equitable considerations. Equitable tolling is unavailable here because the claims based on the shooting attack were not filed within a reasonable period. This is particularly true in a case like this one, which is based on a split-second incident of violence in 1991, unknown to Syria at the time and for years prior to the filing of the complaint.

The ten-year period allowed by §1605(f) is much longer than the periods of limitation state law provides for the causes of action to be asserted under §1605(a)(7) based on other sources of law, as required by <u>Cicippio-Puleo</u> v. <u>Islamic Repbulic of Iran</u> 353 F.3d 1024 (D.C. Cir. 2004). Tortious causes of action of the kind plaintiffs here are asserting, including claims for wrongful death and assault and battery, are invariably subject to much shorter limitations periods than 10 years. For example, the law of the District of Columbia, which the complaint alleges to be the source of law for many of plaintiffs causes of action provides in D.C. Code §12-301 (2007), <u>Limitation of time for bringing actions</u>, a one year limitation for several torts, and a catch-all period of three years for causes of action not otherwise specifically prescribed. Where as here a plaintiff could have filed his claims during a five year period within the 10 years §1605(f) allows, equitable tolling should not allow further time.

In <u>Buonocore</u> defendants moved under Fed.R.Civ.P. 12(b)(6) for dismissal based on §1605(f) and the Court granted the motion. This dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, is legally sound and appropriate, and was the relief requested on the motion. It should be noted, however, that when a claim is filed beyond the time allowed by §1605(f), dismissal is also required for lack of subject matter jurisdiction.

28

§1605(f) marks the duration of the Court's jurisdiction in cases under §1605(a)(7).  This follows from Cicippo's holding that §1605(a)(7) is a purely jurisdictional statute and does not provide a new federal cause of action.   §1605(f) measures the duration of the jurisdiction §1605(a)(7) confers upon this Court, and a claim filed after the time allowed by §1605(f) is dismissible both because it is time-barred and because subject matter jurisdiction is lacking.

Jurisdiction is also lacking for plaintiff Zahav's claims for the further reason that she is not a family member.   The complaint alleges that plaintiff Zahav was a close friend and neighbor of Yair Mendelson, and that she drove up to the scene of the shooting approximately two minutes after it occurred .  She seeks recovery for the "shock and horror" she experienced. Complaint, para. 54.  This is a claim usually considered under the heading "bystander liability." Assuming, arguendo, this claim is legally sufficient under the applicable law of an appropriate jurisdiction, her recovery for emotional distress based on Yair Mendelson's death is barred because she is not a family member.  See, e.g.  Bettis v. Islamic Republic of Iran, 315 F.3d 325, 334-35 (D.C. Cir 2002)(excluding nieces and nephews, limiting recovery to immediate family members).   If her claim is viewed on the unlikely theory that it has a basis independent of Yair Mendelson's death, the claim would be  barred for the additional reason that it would be outside the scope of §1605(a)(7), which is limited to torture, extrajudicial killing, aircraft sabotage and hostage taking and is accordingly barred by Syria's sovereign immunity.

**III.  The complaint's allegations that Syria provided support and resources for acts of extrajudicial killing by the PLO are general, conclusory and boilerplate, and inadequate to provide the nexus and causation required for subject matter jurisdiction under FSIA §1605(a)(7).**

The complaints plaintiffs have filed against Syria in this case, in November 2002 , April

29

2006 and October 2007, are devoid of any allegation of any act or conduct by any defendant

except in entirely conclusory terms.  This is not a case in which the state designated as a sponsor

of terrorism played a major role in the acts that are alleged as the basis for jurisdiction  under

§1605(a)(7) and itself committed one of the four kinds of terrorism listed in §1605(a)(7).   This is

not a case of alleged imprisonment and  torture by a state as many cases are.  Nor is it a case of

more elaborate wrongdoing by a designated state, see e.g. Beecham v. Socialist People's Libyan

Arab Jamahiriya, 424 F.3d 1109 (D.C. Cir. 2005) and Kilburn v. Socialist People's Libyan Arab

Jamahiriya, 376 F.3d 1123 (D.C. Cir. 2004).

       The complaint's allegations of support are entirely general, conclusory and

boilerplate and are not tied to either shooting or bombing.  For example, under the heading THE

TERRORIST SHOOTING where one expect to find the allegation of a nexus if there is one the

complaint alleges merely the Syrian defendants "continued to conspire with and systematically

provide massive material support and resources ..." (¶46), and further, the terrorist shooting was

carried out "utilizing funds, weapons, terrorist training and othe rmaterial support, resources, aid

and asistance provided by the Syrian defendants..." (¶56).

     The support described under the heading THE TERRORIST BOMBING is equally

without focus and nexus, alleging that the Syrian defendants "continued to conspire with and

systematically provide massive material support and resources..." (¶58); the bombing was carried

out "utilizing funds, explosives, terrorist training and other material support, resources, aid and

assistance provided by the Syrian defendants (¶66).

     With respect to the Syrian Arab Republic and each of the other eight Syrian defendants

the complaint alleges in identical terms that the defendant provided material support and

resources for the commission of acts of extrajudicial killing including the terrorist bombing and

the terrorist shooting,  ¶18 Syrian Arab Republic; ¶19  The Syrian Ministry of Defense; ¶20

Mustafa Tlass; ¶21 Syrian Military Intelligence; ¶22 Hassan Khalil; ¶23 Assef Shawkat; ¶24 Ali

Douba; ¶25 Syrian Air Force Intelligence Directorate and ¶26 Ibrahim Hueija.   Elsewhere the

complaint tracks the kinds of support enumerated in the definition of support in 18 U.S.C.

§2339A(B),  always in general terms expansively stated see e.g. ¶'s 32 - 35.   The complaint

claims there was "an agreement reached between Syria and the PLO and its organs in 1968,"

which remains in force today." ¶31.

A reading of the complaint compels the conclusion that plaintiffs know of no basis for

tying Syria to the shooting or the bombing sufficient to establish jurisdiction under §1605(a)(7).

Given the vast scope and generality of their allegations of support, plaintiffs are hoping, one

supposes, to launch through "jurisdictional discovery" their private inquiry into Syria's foreign

policy and national security measures with respect to Palestine in the hope of securing the multi-

million dollar civil recoveries, including punitive damages,  the complaint is demanding.  To

subject a sovereign foreign state to such an inquiry in private civil litigation would be an awful

and unprecedented repudiation of equal sovereignty.

The generality of plaintiff's complaint contrasts strikingly with the allegations of nexus

and direct action by Libya in <u>Kilburn</u> and <u>Beecham</u>.

In both <u>Kilburn</u> and <u>Beecham</u> a clear nexus and direct participation in terrorist acts were

charged, not simply general support as in the present case.

<u>Kilburn</u> states:

... we underline that the only issue before us here is jurisdictional

31

causation, because §1605(a)(7) is solely a jurisdictional provision. Cicippio-Puleo, 353 F.3d at 1032. To succeed in the end, the plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action. Id. ... Whatever the ultimate source may be, it will no doubt carry with it--as a matter of substantive law--its own rules of causation. ...

    In this case, there is no doubt that the plaintiff's allegations satisfy the proximate cause standard. The complaint alleges that, after the United States bombed [*1130] Tripoli, "Libyan agents in Lebanon made it known that they wanted to purchase an American hostage to murder in retaliation." Compl. P 13. It specifically asserts that Peter Kilburn "was purchased and killed by members of the Arab Revolutionary Cells," id. P 21, "whose acts were funded and directed by Libya," id. P 26 (emphasis added). A subsequent declaration makes clear that the plaintiff's allegation is not just that ARC was "supported" and "funded" by the Libyan government, but that it was "directed" by that government "and acted as its agent in Lebanon to carry out terrorist activities, including the purchase and assassination of Peter Kilburn." Decl. of Ambassador Robert Oakley (Ret.) P 14 (hereinafter "Oakley Decl."). If proven, these allegations are more than sufficient to establish that the acts of the Libyan defendants were the proximate cause of Peter Kilburn's injury and death.

    The complaint in <u>Beecham</u> similarly alleges a clear nexus and direct terrorist acts:

    Plaintiffs are victims and estate representatives of victims injured or killed in the 1986 bombing of the "La Belle" discotheque in West Berlin, Germany. Their complaint alleges as follows. Defendant [**2] Colonel Muammar Al-Ghaddafi, head of the Libyan government, directed Libyan agents to plan, prepare, and execute the attack. Libyan agent Souad Chraidi transported plastic explosives, a detonator, and a timing device from the Libyan embassy in East Berlin to an apartment in West Berlin. Chraidi and others made the final preparations for the attack, fitting the detonator and timer to the explosives, which they concealed in a bag for delivery to the discotheque. On the night of the bombing, Verena Chanaa and Andrea Hausler brought the bomb to the discotheque, where they activated the timing device, placed the

bomb at a seat in the center of the dance floor, and left. In the early morning hours of April 5, 1986, the bomb exploded with approximately 260 people inside the discotheque. Three people were killed and more than two hundred injured.

Among other things, plaintiffs point to telex communications between Libyan intelligence in Tripoli and the Libyan embassy in East Berlin confirming defendants' responsibility for the attack. Colonel Al-Ghaddafi purportedly admitted as much to a German ambassador in a meeting in 2001.

In the present case, the complaint charges Syria solely with support for extrajudicial killing by the PA or PLO, repeatedly embellished by conclusory allegations of conspiracy, aiding and abetting, acting in concert and in pursuit of a common goal and design, and the like, see e.g. paras. 54 and 55, and not with the commission itself of any of the four acts of terrorism listed in §1605(a)(7).

The allegations are too general and conclusory to satisfy FSIA §1605(a)(7). The need for details and specificity in alleging the furnishing of material support and resources under FSIA §1605(a)(7) was addressed by this Court in Owens v. Republic of Sudan, 374 F.Supp.2d 1, 14-16 (D.D.C. 2005) (JDB) relying principally on the analysis of the Court of Appeals in Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002) with respect to allegations of acts of terrorism under FSIA §1605(a)(7) such as torture and hostage taking.  The Court in Owens said:

. . .the Court concludes that the meaning of "material support" must be alleged with a degree of specificity sufficient to determine that they "state a proper claim for [the provision of material support or resources] under the FSIA." Price, 294 F.3d at 94. The complaint in this case fall short of that standard. Plaintiffs make several conclusory allegations that the Sudan defendants provided "cover", "support", and "sanctuary" to al Qaeda and Hizbollah, Compl. PP 2, 7, a single allegation that the Sudan defendants entered into an

33

unspecified [**38]  agreement with al Qaeda and Hizbollah through
which those organizations received "shelter and protection from
interference," id. P 8, and a single allegation that a meeting occurred
in the Republic of Sudan between the leaders of al Qaeda and
Hizbollah to plan the embassy attacks, id. These allegations do not
provide enough information to determine the nature of any
relationship between al Qaeda and Hizbollah, the form the alleged
acts of "support" took, and whether those acts qualify as "material
support or resources" within the meaning of the statute. The
complaint "in its present form is simply too conclusory to satisfy §
1605(a)(7)." Price, 294 F.3d at 85.

Judged by this standard the complaint's allegations of material support in this case are too

conclusory to satisfy FSIA §1605(a)(7).  Because the violence at issue in Owens was notorious,

high profile and intensively investigated -- the simultaneous explosion of truck bombs at U.S.

Embassies in Tanzania and Kenya, killing hundreds and injuring thousands – it was clear that

plaintiffs could state their allegations in  greater detail and overcome the deficiencies  in the

complaint's conclusory pleading, the Court in Owens gave plaintiffs leave to amend their

complaint.   There is no equivalent basis in the present case to believe the plaintiffs after filing

three complaints can allege nexus and causation sufficient to support subject matter jurisdiction

under FSIA §1605(a)(7).

Plaintiffs make repeated use of the word "specific," perhaps in recognition that the

complaint is too general.  For a few examples, see "specific intention" –paras. 30, 33 and 58; and

"specific purpose" – paras. 56 and 66.  This rhetorical device fails.  The phrases are no more

meaningful than the words themselves unadorned by "specific."

Again and again, the complaint's allegations are conclusory and fail to allege sufficient

causal connections between the support alleged in general terms,  and the deaths in the shooting

34

attack in 1991 and the bombing attack in 2002, except in conclusory terms, alleging for example

that the terrorist shooting attack was carried out by the "PLO and its organs" utilizing

> funds, weapons, terrorist training and other material support,
> resources, aid and assistance provided by the Syrian defendants for
> the specific purpose of carrying out that terrorist shooting and other
> such acts of extrajudicial killing and international terrorism.

Complaint, para. 56. The complaint employs similar language with respect to the bombing

attack, para. 66.

Plaintiffs allegation of proximate cause in paragraph 70 of the complaint serves to

confirm the absence of such cause:

> 70. Defendants' actions were willful, malicious, intentional,
> wrongful, unlawful, negligent and/or reckless and were the
> proximate cause of the terrorist shooting and the terrorist bombing
> and the deaths of decedents Yair Mendelson, Keren Shatsky and
> Rachel Thaler.

It does seem that fully considered, the imposition upon a foreign sovereign of the burden

of proving its entitlement to immunity is misplaced though appellate decisions have taken this

position, see Kilburn, supra, 376 F.3d at 1133, citing Phoenix Consulting, Inc. v. Republic of

Angola, 216 F.3d 36, 40 (D.C. Cir. 2000). We have found no U.S. Supreme Court decision that

so holds, particularly in a case like this one, where there is no question the defendant is a foreign

state for purposes of the FSIA , and the statutory criteria for loss of something as crucial to Syria

as its immunity in the courts of what is regrettably, but unquestionably, an unfriendly

government, are as problematic and susceptible to abuse as they are under the terms of FSIA

§1605(a)(7).

**IV.    Multiple Violations Of Due Process and Fundamental Fairness under the
Constitution of the United States and International Law Require The**

**Dismissal Of This Action Against The Syrian Defendants Under Fed.R.Civ.P. 12(b).**

There are several denials of due process and fundamental fairness that warrant dismissal of this action.  The designation of Syria as a state sponsor of terrorism was made and is being continued by the U.S. State Department without affording Syria any semblance of due process.  At no time, either at the imposition of the designation or its continuance has Syria been given notice, or an opportunity to be heard, or to confront or present evidence.  It has not been afforded any opportunity to contest the designation.  The designation is essentially political,.  It is arbitrary, capricious and unsupported in fact and as presented above violates the U.N. Charter.

A second lack of due process is the contention in this action that personal jurisdiction over Syria can be obtained without adherence to the due process requirements of International Shoe and its progeny.  International Shoe Co. v. Washington, 326 U.S. 310 (1945).  The due process analysis under International Shoe requires personal jurisdiction to be supported by minimum contacts of a defendant with the territory of the U.S.  This requirement of due process is well-established and should be followed in this case.

There is no question that the Syrian Arab Republic lacks contacts with the U.S. sufficient to constitute minimum contacts under International Shoe.

The holding in Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002), that foreign states are not "persons" protected by the Fifth Amendment, denies due process to foreign states both in actions brought under sec. 1605(a)(7) and generally.  It is not limited to a state's entitlement to due process as a litigant, and the considerations advanced in Price for its holding range far beyond the context of litigation.  It subjects the foreign personality

36

of a foreign sovereign that may be demonized, feared and hated in the U.S. without essential safeguards for fairness and due process.

The Syrian defendants respectfully submit that <u>Price</u> paid insufficient attention to the difficult conditions in which foreign sovereign defendants are placed by the FSIA.

When a foreign state is hailed into a U.S. court to defend an action under the FSIA, it is subject to much greater problems than aliens face generally in U.S. courts. A foreign state designated as a sponsor of terrorism is branded not merely as alien, but as an enemy of the U.S., a threat to our security, a terrorist state, an "evil empire." In <u>Asahi Metal Indus. Co., Ltd.</u> v. <u>Superior Court</u>, 480 U.S. 102 (1987) the Supreme Court identified the reasons great care and reserve should be exercised in asserting personal jurisdiction over aliens generally however friendly. See 480 U.S. at 115.

There is an additional factor under the FSIA where the alien litigant is a foreign state. FSIA sec. 1606, requires with respect to any claim for which a foreign state is not entitled to immunity, that the foreign state "shall be liable in the same manner and to the same extent as a private individual under like circumstances;..." There should be no question that in determining a foreign state's liability under section 1606, the foreign state should have the same entitlement to due process as a private individual. This is as it should be because the substantive and procedural rules in U.S. courts have been developed on the requirement that they are operative between persons entitled to due process and are the product of institutions and procedures that intend due process, are structured and strive to achieve its objectives. This strongly supports the conclusion that a foreign state deemed a private individual under sec. 1606 must be treated at the outset and throughout the FSIA proceedings as a person entitled to due process. There are few

37

greater measures of a nation's commitment to fair trials than its insistence that even an enemy foreign state, is assured a fair trial in fact and in appearance.

The law with respect to personal jurisdiction recognizes that a litigant lacking the minimum contacts with a forum that due process requires, can be expected to be at a considerable disadvantage and it is unlikely that "fair play and substantial justice" will be done.  When one litigant is denied due process, rules developed on the assumption due process has been granted to all and will be fully adhered to, will operate unfairly.

Fair play and substantial justice requires that a foreign state treated as a "private individual" under FSIA sec. 1606 must also be treated throughout as a "person" protected by the Fifth Amendment.

The unilateral, unexplained and unchallengeable designation by the United States of Syria as a state sponsor of terrorism, from which severe negative consequences follow under U.S. law is an extreme example of arbitrary foreign policy acts of the political branches in violation of the Constitution of the United States and international law.  The deprivation of sovereign immunity under sec. 1605(a)(7), and the assertion by the U.S. that its Courts have the power and authority to adjudicate claims against certain nations the U.S. designates, for allegedly providing material support for acts based on events occurring entirely outside and unrelated to the U.S., which often involve the violent struggle of other peoples, violate principles of sovereignty, comity, fundamental fairness and due process under international law.  For these reasons, independent of violations of the Due Process Clause of the U.S. Constitution, sec. 1605(a)(7), violates sovereign rights of foreign nations protected by international law binding on the U.S.

The Syrian defendants believe they are entitled to due process of law and fundamental

38

fairness in this case.  They realize, however, the hurdle that is presented by the Price case, supra,

and that the law of this Circuit appears to deny due process protection to foreign states.  It is

necessary to argue for due process and fundamental fairness nonetheless to preserve the argument

for appellate consideration, if necessary.

## Conclusion

The motion of the Syrian Arab Republic and the Syrian defendants for dismissal of this

action against them should be granted.


Dated:    November 26, 2007                              Respectfully submitted,
                                                                            s/
                                                                Ramsey Clark
                                                                          /s
                                                                Lawrence W. Schilling
                                                                37 West 12th Street, 2B
                                                                New York, NY 10011
                                                                212-989-6613
                                                                212-979-1583 fax
                                                                lwschilling@earthlink.net

                                                                          s/
                                                                Abdeen Jabara
                                                                113 University Place
                                                                8th Floor
                                                                New York, NY 10003
                                                                212-598-0646
                                                                Attorneys for the Syrian Defendants

39